**Ann E. Smithers, Appellee, v. Russell Henriquez, Appellant.**

**Gen. No. 38,070.**

Opinion filed November 4, 1936.

SIMS & STRANSKY, of Chicago, for appellant; FRANK-LIN J. STRANSKY and JAMES P. CAREY, JR., of counsel.

FINN & MILLER, of Chicago, for appellee.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from a judgment entered in the circuit court against the defendant and in favor of plaintiff for the sum of $7,500 for injuries sustained on May 10, 1931, as the result of a collision between two automobiles, one of which was in the possession of and being driven by the defendant, the other automobile being in the possession of and being driven by the husband of the plaintiff. The collision occurred at or about the intersection of Harlem avenue and Higgins road in Chicago, Illinois.

Plaintiff's amended declaration consisted of three counts, the first of which charged defendant with having negligently operated his automobile at the time of the accident, resulting in injury to plaintiff and that plaintiff was in the exercise of due care for her own safety. The second count charged defendant with having negligently operated his automobile in backing said automobile in a northwesterly direction from Higgins road on to Harlem avenue. The third count charged the defendant with not having a red rear light on his automobile in violation of the statute of the State of Illinois.

The evidence offered by plaintiff tends to show that at the time of the accident she was riding in the front seat of a Dodge automobile which was being driven by her husband in a northerly direction on Harlem avenue at about 2:30 o'clock in the morning. Plaintiff had accompanied her husband who was a musician and had been playing in an orchestra at a dance, and they were on their way home with two other persons in their car when the accident occurred. When the automobile in which plaintiff was riding approached the intersection of Harlem avenue with Higgins road and they were about 35 feet south of that intersection, they slowed down at the traffic sign which was on the corner. The defendant, who was driving a Buick automobile and who had shortly before passed them on

Harlem avenue at a high rate of speed and who had turned from Harlem avenue east on to Higgins road, on finding that the latter street was under repair with obstructions having been placed thereon, which were lighted with smudge pot lights, preventing him from progressing further, endeavored to get back on to Harlem avenue and, in doing so, suddenly backed his automobile, which was without a rear light, around the southeast corner of Harlem avenue and Higgins road and crashed into the plaintiff's automobile before he could avoid it, thereby throwing plaintiff from her seat in the automobile and against the dash board of their car breaking her nose and her jaw and lacerating her face and mouth, resulting in the loss of several teeth and caused other serious injuries as a consequence. The evidence further shows that plaintiff screamed as she saw defendant's car backing into their automobile.

On behalf of defendant it is contended that he had been attending a party at a friend's house and was returning home in company with a young lady who was seated beside him in the front seat of an automobile which he was driving north on Harlem avenue; that when he reached the intersection of Harlem avenue and Higgins road, he stopped his automobile at the southerly line of Higgins road and before he had a chance to proceed north, he was crashed into from the rear by the automobile occupied by the plaintiff and pushed by the force of the impact into the intersection with Higgins road.

The evidence shows that before the accident, on their way home, the plaintiff, her husband and their friends stopped at a barbecue stand and got some sandwiches and later stopped and bought some ice cream which they intended to take home. Plaintiff's husband testified that on the night of the accident he had intended to turn left at Higgins road in order to reach the home of one of the parties in his automobile.

The evidence further shows that at the party attended by the defendant and his lady companion, various kinds of liquor were served, and the defendant testified that he had had two glasses of beer. The lady who accompanied him testified that she did not know whether he had had any more liquor or not.

As is usual in cases of this kind, the evidence is conflicting. The lady riding with the defendant testified that when the collision occurred the car they were riding in was on the east lane of the road and that the right rear of the car was struck and the right fender was damaged, which, of course, would place plaintiff's automobile east of the pavement entirely. She also testified that Hlavacek, a witness for defendant, at the time of the accident was north of the northwest corner of Harlem avenue and Higgins road some 300 feet away and that he shifted into first gear and was going ahead. This, she testified to having seen, although the night was concededly dark.

The evidence regarding the rear light on defendant's automobile is also controverted. All the witnesses riding with the plaintiff testified that when defendant's automobile passed them a mile or two south of Higgins road, it was going at a high rate of speed and they remarked that the tail light was not lighted. The defendant and some witnesses in his behalf testified that the tail lamp was lighted.

As to the obstruction on Higgins road, a witness for the plaintiff testified that an obstruction was there. Some of the witnesses went to view the scene of the accident on the following day and they stated that the obstruction was still there. The witnesses who testified on behalf of defendant, including a former employee of the highway department, stated there was no obstruction on Higgins road. The employee for the highway department, however, stated that so far as he could remember there was no obstruction there, but

that the records in the office of the highway commissioner would show whether permits had been issued to close that street pending the doing of the work, but the records were not produced.

One of the main contentions made by the defendant as to the errors committed by the trial court, was with reference to the examination of the jurors on their *voir dire*.

On May 8, 1934, prior to the trial of this cause plaintiff filed an affidavit in which in substance it was stated that she had been informed that the suit was being defended by the American Insurance Company of Boston, Massachusetts and that said company was, therefore, vitally interested in said cause and that she had been informed that the attorney who was actively defending the case was representing the insurance company in the matter and asked the court to permit counsel for plaintiff in the examination of jurors on their *voir dire* to question the prospective jurors as to their financial interest, if any, in the above company, or, otherwise, her interests would be prejudiced.

It is admitted in the record that the counsel representing the defendant is employed by the insurance company for the purpose of defending the suit.

When the jurors were being examined counsel for plaintiff asked the following question of the entire jury:

"Q. Now I would like to ask this question of you and all of the jurors as a whole. Are you, Mr. Long, or any of you gentlemen, interested financially either as stockholders or otherwise, in the American Employers Insurance Company?"

The filing of the affidavit and the proceedings in relation thereto took place out of the presence and hearing of the jury. The defendant objected, asking that the jury panel be discharged for the reason that the jury had been asked the question which we have

quoted above, and further stated that that question was not necessary to aid the plaintiff in reaching a decision as to whether she should exercise any right of challenge; that the purpose of the question was to suggest to the jurors that the defendant carried insurance against the alleged liability in the suit and that the asking of the question unreasonably and substantially prejudiced the defendant's interests. The court overruled the objection of the defendant and permitted the plaintiff's attorney to ask the question aforesaid collectively of the jury.

There are many divergent opinions, policies and suggestions in the various States of this country as to whether or not it is reversible error for the jury to be asked on their examination as to their qualifications to sit as jurors, if they have any interest or connection with an insurance company who is admittedly an insurer in the case and the real party in interest, being represented in court by its counsel and having charge of the defense, implying thereby that if this fact becomes known, the jury may be unduly influenced as to the liability and the amount of damages will be increased thereby. The rule in this regard varies in the different States, some States compelling the plaintiff by statute to make the insurance company a party defendant (Wisconsin laws) while in this State it is held permissible to ask such questions if done in good faith. If the lawyer is exercising a ''right'' on behalf of his client, it is difficult for a court to determine or even question what his motive may be, so long as he is properly exercising the ''right.'' The decisions set forth possible errors which may occur when the mention of the insurance company may arise during the trial, either on the *voir dire* examination or during the admission of evidence. The consensus of the different opinions seems to be that if it is apparent to the court that the plaintiff upon the introduction of evi-

dence makes an attempt to make it plain to the jury that an insurance company is involved, then the court may sustain the objection on the ground that it is not an issue in the case, and if prejudicial error has been committed by getting before the jury irrelevant and prejudicial facts which cannot be corrected, except by granting a new trial, to act accordingly. But, on the examination of the jurors as to their competency, in order that a fair trial may be had, it has always been considered permissible to inquire of a juror whether he has any interests, relationships or experiences which might affect his judgment either sympathetically or prejudicially. There is no uniform practice in this State or in other States relative to the form of questions to be asked a prospective juror. Some States compel owners of automobiles to have them insured. Most every intelligent person in this State knows about automobile insurance, and its almost universal use. Why should a juror be presumed to know less when he becomes a juror than he did as a member of the great body of citizens from which he was selected? To illustrate the opinions on this question in this State, two cases are here cited:

In the case of *Iroquois Furnace Co. v. McCrea,* 191 Ill. 340, at page 344, it is said:

"It is complained that the court erred in permitting counsel for appellee to question certain jurors upon their *voir dire* as to their interest in the Union Casualty Company. It appears that an attorney representing that company, was present with the attorneys for appellant at the trial. The question was proper at least for the purpose of enabling counsel to exercise their right of peremptory challenge, if for no other purpose. (*O'Hare v. Chicago, Madison and Northern Railroad Co.,* 139 Ill. 151; *American Bridge Works v. Pereira,* 79 Ill. App. 90, and cases therein cited.)"

In the case of *Mithen v. Jeffery,* 259 Ill. 372, the court at page 375, said:

"During the examination as to his competency, of one summoned as a juror he testified that his business was all kinds of insurance, including liability insurance. The following questions and answers followed: 'Do you know Mr. Jackson?'—'No.' 'Mr. Snow, here?'—'No.' 'The Travelers Insurance Company?' Objection was made to the last question, and while the court was considering the motion the attorney for defendants moved to discharge the panel on account of the questions being asked. The court overruled the motion, to which the attorney excepted and then stated that his objection was to the question. The attorney for plaintiff then further examined the juror as to whether, in handling liability insurance, he came in contact with personal injury claims, to which he answered that the corporation did but he did not, and that his work was fire losses. He was peremptorily excused. It is urged that the propriety of the question was not saved for review, but we are of the opinion that it was. Objection was made to the question, and while the attorney for the defendants also made a motion to discharge the panel, he stated at the time of the ruling that his objection was to the question. It is not proper for an attorney to directly inform a jury that a defendant is insured against liability in the suit on trial, and, of course, the attorney cannot be permitted to accomplish the same result indirectly in the examination of jurors. It is the right of an attorney to ascertain whether a juror has any interest in or relation to claims or suits of the same character as the one being tried, for the purpose of exercising the right of peremptory challenge, (*Iroquois Furnace Co. v. McCrea,* 191 Ill. 340,) but that can be readily done by an examination which would not lead the jury to understand that the defendant is insured

against liability and is without substantial interest in the question of damages. The purpose of an attorney in making such inquiries as were allowed in this case is to inform the jury that a defendant is insured, and such examination is improper. (*Eldorado Coal Co. v. Swan,* 227 Ill. 586; *McCarthy v. Spring Valley Coal Co.,* 232 id. 473; *Aetitus v. Spring Valley Coal Co.,* 246 id. 32.)''

The two cases just quoted illustrate some of the distinctions made in deciding this question.

In the case of *Steinkamp v. F. B. Chamberlain Co.* (Mo. App.), 294 S. W. 762, the court in upholding the right of counsel for plaintiff to interrogate the jurors on their *voir dire* as to whether or not they were stockholders in a certain insurance company, or acquainted with persons connected with that company, where it was undisputed that this company was in fact interested in and conducted the defense on behalf of the defendant employer, said:

''Indeed we do not see how a lawyer having a proper sense of his responsibilities to his client could have failed to interrogate the jurors concerning their relations to parties vitally interested in the defense of the case and in the result of the trial.''

In the case of *Grant v. National Ry. Spring Co.,* 91 N. Y. S. 805, the court said:

''If some insurance company was interested in the case, then there was good reason why plaintiff's counsel should inquire and be certain that no juror interested in that particular insurance company or any other like company was on the jury. It may be claimed that counsel often make these inquiries when they have no reason to suppose that there are any persons among the jurors interested in these insurance companies. The answer is, they do not know, and inquire for information. It is not safe to assume in these times that men summoned upon petit juries may not be

interested as stockholders in any companies that are likely to make money and pay good dividends; men do not disclose to the public where their money is invested, and the only safe way is to ask if they have such interests. The questions are proper and competent, and the court may not exclude answers to such inquiries or charge counsel with bad faith or improper motives in making the inquiries. If the questions are proper, it is not important what the motives of counsel may be.''

Most of the decisions with relation to this question are qualified by the statement that the question must be asked by counsel *in good faith*. In discussing this subject it is stated in 56 A. L. R. at page 1472:

''In some jurisdictions, particularly Missouri, which permit the plaintiff, on examination of the jury on *voir dire*, to interrogate the jurors as to the interest which they may have in a particular insurance company, the privilege is qualified by the requirement that the plaintiff must actually know that the insurance company referred to carries the defendant's liability insurance.''

In the instant case the affidavit filed and the admission of counsel on the record show the particular company that insured the defendant in this case was present at the trial by its counsel.

The legislature of this State has seen fit to give to parties litigant the right of challenge (ch. 110, ¶ 194, sec. 66, and ch. 78, ¶ 14, sec. 14, Ill. State Bar Stats. 1935) in order to enable them to select a jury of men competent to serve in the administration of justice without prejudice, sympathy or partiality.

In the case of *Dowd-Feder v. Truesdell,* 130 Ohio St. 530, 200 N. E. 762, it was said: ''Any rule of law which denies a litigant reasonable latitude in the examination of prospective jurors as to their qualifications, in order to enable him to exercise such peremptory chal-

lenges judiciously and intelligently, deprives him of a substantial right."

In the case of *Donovan v. People,* 139 Ill. 412, the Supreme Court said in refusing defendant's counsel the right to examine the jurors for cause:

". . . the law-making power of the State has deemed it wise to give the right of peremptory challenge, to be exercised in the discretion of the party entitled, and the courts are not authorized to limit or restrict the right, or prescribe rules which shall render it unavailing. Such reasonable examination by counsel should always be allowed as will enable the court to see that the jurors stand indifferently between the parties and are possessed of the requisite qualifications, and also to enable counsel to challenge for cause, if cause exists, or to exercise the right of peremptory challenge when in their judgment it is deemed necessary or advisable."

It is further claimed by the defendant that the prejudice which he claims was engendered by the filing of the affidavit and the asking of the questions of the jurors as a whole was further accentuated by inquiries made of the jurors individually. Two of the first jurors, of whom the question as to their vocations was asked individually, stated that they were in the insurance business and they were then asked if they had any connection with the claim department or with the legal end of it and their answers were "No." These questions were proper and we cannot see that the defendant could be prejudiced thereby.

The insurance company, by its contract of indemnity, became an interested party before the court. We do not believe any hairline inference should be drawn because of the mere mention of a name by which the one question complained of should be construed as being so destructive to the trial that the verdict must be set aside. We believe it is only where the

court can say, after a consideration of the entire record, that a fair trial has not been had or that justice has not been done, that the verdict and judgment should be set aside. Much must be left to the discretion of the trial judge. In this case plaintiff's counsel filed the affidavit and gave a copy of the same to the defendant's counsel and the same was considered by the trial court out of the presence of the jury. We think the filing of the affidavit and the disclosing of what the lawyer intended to do, well in advance of the trial and out of the presence of the jury, should not be construed as an act of bad faith without further evidence thereof. This applies even if we adopt the theory of questioning the motive of a person who is concededly in the exercise of a right. Many of the cases cited by counsel for defendant are cases in which the insurance company was mentioned during the taking of the evidence, which raises a different question than occurs during the examination of a prospective juror on his *voir dire*. In this case as heretofore stated, the matter was discussed and the question passed upon by the court in advance of the trial.

In the case of *Pavilonis v. Valentine,* 120 Ohio St. 154, 157, 165 N. E. 730, it is stated:

". . . the questions that may be propounded necessarily vary with the varying issues, circumstances, and parties, as such issues, circumstances, and parties may operate to influence or bias particular jurors, as distinguished from jurors generally. Because of the great variety of such influences, the character and scope of the questions that may be propounded necessarily cannot become standard, but must be controlled by the court in the exercise of a sound discretion, the court having for its purpose of securing to every litigant an unbiased jury." Counsel for defendant also relies on the case of *Vega v. Evans,* 128 Ohio St. 535.

In the case of *Dowd-Feder v. Truesdell,* 200 N. E. 762, which is the last expression of the Supreme Court of Ohio, the Supreme Court reviews the *Pavilonis* case and the *Vega* case, and stated that they had reconsidered the question proper on the *voir dire* examination hoping to find some middle ground so as to afford all parties a fair trial and further said:

"(3)  In the examination of a juror upon his *voir dire,* in cases involving property damage, personal injury, or both, he may be asked the general question whether he has or has had any connection with or interested in a casualty insurance company. If the answer be in the affirmative, the juror may then be asked the name of such company and the nature of his connection with or interest therein. . . .

"(4)  It is neither wise nor desirable for this court to prescribe the specific form such interrogatories are to take, or the manner of their presentation. That is a matter wholly for the trial court to determine in the exercise of its sound discretion and in the light of all the facts and surrounding circumstances. . . ."

In view of the various authorities in this State and throughout the country and the desire of the courts that the litigants receive a trial before a jury of fair minded men, we think much must be left to the discretion of the trial court to see to it that a jury of men are selected who will be fair alike to the plaintiff and defendant. *Frochter v. Arenholz,* 242 Ill. App. 93; *Aetitus v. Spring Valley Coal Co.,* 246 Ill. 32. We do not think prejudicial error was committed in permitting this question to be asked.

The question of proximate cause and preponderance of the evidence being matters for the jury's determination, they were properly left to the jury. It is only where this court can say that the verdict of the jury is against the manifest weight of the evidence that we would be jusified in setting aside the verdict of the

jury for such reason. Motions made at the conclusion of the plaintiff's evidence and again at the end of the hearing of all the testimony were properly overruled.

Complaint is made as to some of the instructions given and refused. Some of the objections now made were not made at the time of the trial, in accordance with the then existing section 67 of chapter 110 of the new Practice Act. However, from a review of the instructions as an entirety, it appears to us that the jury was fairly instructed as to the law pertaining to the case.

Objection is also made to the overruling of the motion in the arrest of judgment on the ground that one of the counts in the declaration charged wilful and wanton conduct while the other counts charged negligence and violation of a statutory duty. No suggestion was made to the court that the jury be directed to find a separate verdict upon the count charging wilful and wanton conduct. Chapter 110, ¶ 196, Cahill's 1933 Rev. St. provides:

"(2) Whenever there are several counts in a *complaint based on different demands, the court shall, on the demand of either party, direct the jury to find a separate verdict upon each.* But if, in any case, there are several counts, and an entire verdict is rendered thereon, the same shall not be set aside or reversed on the ground of any defective count, if one or more of the counts be sufficient to sustain the verdict."

In the Appellate Court of this district in the case of *Price v. Bailey,* 265 Ill. App. 358, and also in *Provenzano v. Illinois Cent. R. Co.,* 272 Ill. App. 475, 482, it was held that a general verdict will not be set aside where some counts of the declaration charged the defendant with negligence and other counts charged him with wilful and wanton conduct, there being no evidence to sustain wilful and wanton conduct.

In the case of *Guianios v. DeCamp Coal Min. Co.*, 242 Ill. 278, at page 281, the court said: "In tort the plaintiff may prove a part of his charge if the averment is divisible, and proof of a part of the allegations, if sufficient to sustain a case, will sustain a judgment. . . . In this case, if the proof showed that the act was caused by the negligence of appellant, recovery could be had even though the negligence was not wanton or willful." We think the motion in arrest of judgment was properly overruled. .

It is next contended that the verdict of the jury for the sum of $7,500 is excessive.

The evidence shows that the plaintiff was 24 years of age, working as a clerk for a telephone company at the time of the accident; that as a result of the accident she sustained a laceration about four inches long under her chin, her nose and jaw were fractured and several teeth had to be removed.

Dr. Secunda, the doctor who attended the plaintiff, testified that she sustained a fracture of the lower jaw as well as a fracture of the upper jaw; that the laceration under her chin required eight sutures; that her nose, that is the septum, was diverted from the medium line; that her nose bled profusely as did her mouth and lower jaw; that her front teeth were knocked loose from the alveolar tissue down below the teeth; that plaintiff was unable to move her jaw, could not work it up and down; that it took 48 hours to control the hemorrhage and that in doing so it was necessary to pack the nasal passage leading back from the nose to the mouth, which the doctor packed through her mouth and that he set the bone in position; that six of her teeth were knocked loose from the alveolar process as though they were broken, you could take them between your fingers and move them all the way around; that he sent her to an oral surgeon or specialist and that he set and wired her jaw and the wir-

ing of the teeth and jaw kept them in a rigid position; that she developed a nervous condition known as neurasthenia and that she trembled and cried frequently; that the patient still has an interlocking of the jaw and that the condition is permanent.

Dr. Potts, the other doctor who attended plaintiff, stated that upon examination he found that she had a fracture of the upper right neck of the condyle, or joint surface, and that this controls the lateral and forward motion of the jaw; that the X-rays showed a fracture of the alveolar process which is a part of the jaw bone and this affected her lower front teeth and they were all loose; that wire splints were put on to try to hold the teeth in place and arch bars were wired together and a rubber bandage put around her head; that her teeth had since been removed and that she is wearing a plate with eight artificial teeth; that the movement of her jaw is limited and the condition is permanent; that this limitation interferes with her ability to eat.

Plaintiff stated that she has trouble with her jaw. In the morning it is stiff and when she opens her mouth the joint of the jaw bone catches near her right ear and that she sometimes has trouble in speaking.

The injuries which plaintiff sustained as a result of this collision as set forth in the evidence, were both serious and permanent. The disfigurement to this young woman's face, the breaking of the jaw bone (and other bones of the face), the loss of her teeth, and also the mental and physical suffering she endured entitles her to adequate damages which in this case should be for a substantial amount. In view of the evidence we do not feel that the verdict is excessive and it shows that the jury was not prejudiced against the defendant by anything that occurred at the trial.

From a review of all the evidence and the controverted facts, we believe that the jury, having seen and heard the witnesses testify, were well fitted to determine wherein lies the preponderance of the evidence. The finding of the jury was approved by the trial judge and we are not in a position to say from a reading of the record that the judge and jury arrived at a wrong conclusion. We are of the opinion that the judgment should stand.

For the reasons herein given the judgment of the circuit court is affirmed.

*Judgment affirmed.*

Hebel and Hall, JJ., concur.